**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ROCKWELL MEDICAL TECHNOLOGIES,
INC.,

        Plaintiff,

                                 Case No. 11-12027
v.                                Hon. Gerald E. Rosen

DI-CHEM CONCENTRATE, INC., DI-CHEM,
INC., DWAYNE BUCHHOLZ, and KEITH
BUCHHOLZ,

        Defendants.

_____/

**OPINION AND ORDER REGARDING**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**
**AND DEFENDANT'S MOTION FOR RULE 11 SANCTIONS**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____March 25, 2013_____

PRESENT:  Honorable Gerald E. Rosen
                    Chief Judge, United States District Court

## I. INTRODUCTION

Plaintiff Rockwell Medical Technologies, Inc. commenced this action in this Court

on May 9, 2011, asserting state-law claims of breach of contract and tortious interference

against Defendants Di-Chem Concentrate, Inc. ("DCCI"), Di-Chem, Inc. ("Di-Chem"),

and two individuals affiliated with the corporate Defendants, Dwayne Buchholz and

Keith Buchholz.[1]  In essence, Plaintiff alleges that Defendants breached a confidentiality agreement entered into between Plaintiff and DCCI by advising Plaintiff's competitors of Plaintiff's interest in purchasing a manufacturing facility owned by DCCI, and that one of these competitors took advantage of this alleged breach by purchasing the facility from DCCI while Plaintiff remained in negotiations with DCCI to do so.  This Court's subject matter jurisdiction over this action rests upon the diverse citizenship of the parties and an amount in controversy that exceeds $75,000.  *See* 28 U.S.C. § 1332(a).

Through the present cross-motions, each side seeks an award of summary judgment in its favor on some or all aspects of Plaintiff's claims.  In its summary judgment motion, Plaintiff argues that the record establishes as a matter of law that Defendants breached the parties' confidentiality agreement by advising third parties of the parties' negotiations over Plaintiff's possible purchase of DCCI's manufacturing facility.  For their part, Defendants contend in their summary judgment motion that Plaintiff has failed as a matter of law to establish several of the essential elements of its breach of contract and tortious interference claims.  Most significantly, Defendants argue that Plaintiff has failed to produce evidence of a causal connection between Defendants' alleged breach of the confidentiality agreement and the injury identified by Plaintiff — namely, a competitor's purchase of DCCI's facility.  Finally, apart from these cross-

---

[1]To be accurate, Plaintiff's initial complaint asserted additional state-law claims and named DCCI as the sole defendant.  In an amended complaint filed on May 24, 2012, Plaintiff added the three other defendants as parties and limited its theories of recovery to breach of contract and tortious interference.

motions, Defendant DCCI has separately moved for the imposition of sanctions under

Fed. R. Civ. P. 11, arguing that Plaintiff and its counsel failed to conduct a reasonable

inquiry into the facts prior to bringing this suit, and that Plaintiff and its counsel also have

violated Rule 11 by continuing to pursue this action even after a full course of discovery

failed to unearth evidence in support of Plaintiff's claims.

Each of these motions has been fully briefed by the parties.  Having reviewed the

parties' briefs in support of and opposition to these motions, as well as the accompanying

exhibits and the remainder of the record, the Court finds that the relevant allegations,

facts, and legal arguments are sufficiently presented in these written submissions, and that

oral argument would not aid the decisional process.  Accordingly, the Court will decide

the parties' motions "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern

District of Michigan.  This opinion and order sets forth the Court's rulings on these

motions.

## II.  <u>FACTUAL BACKGROUND</u>

### A.    **The Parties**

Plaintiff Rockwell Medical Technologies, Inc. is a Michigan corporation with

plants in Michigan, South Carolina, and Texas that manufactures, among other things,

hemodialysis concentrates that it sells to medical supply distributors.  Defendant Di-

Chem Concentrate, Inc. ("DCCI") is a Minnesota corporation that was formed in 1996 in

order to purchase and operate a liquid acid and bicarbonate manufacturing facility in

Lewisberry, Pennsylvania (the "Facility").  Plaintiff and DCCI are competitors in the

manufacture and sale of liquid acid and bicarbonate products.

Defendant Dwayne Buchholz is DCCI's sole shareholder, president and director. He also is the sole shareholder, president, and director of Defendant Di-Chem, Inc ("Di-Chem"), a Minnesota corporation formed in 1982 that, among other things, manufactures and packages certain hemodialysis components. When DCCI began considering in 2009 whether to sell or otherwise dispose of the Facility, it retained Dwayne Buchholz's son, Defendant Keith Buchholz, to pursue these efforts.

**B.    Plaintiff and DCCI Enter into a Confidentiality Agreement in Connection with Their Negotiations over Plaintiff's Possible Purchase of the Facility**

DCCI's largest client was Minntech Corporation, which purchased liquid acid and bicarbonate from DCCI and then sold this product to a customer in Venezuela. In 2009, however, Minntech lost its Venezuelan business and discontinued purchasing large amounts of product from DCCI. As a result, DCCI became unprofitable, and the company began to explore the possibility of selling its Facility. Consequently, in late 2009 and early 2010, DCCI contacted other companies in the industry to gauge their possible interest in acquiring the Facility. Among those it contacted were Plaintiff and Exim America Corp. ("Exim"), a company that purchased hemodialysis liquids from Plaintiff and exported them to Venezuela.[2]

Although Exim indicated at the time that it was not interested in obtaining the

_____

[2]In the 2008-2010 time frame, Exim purchased nearly all of its hemodialysis liquids from Plaintiff, and none from DCCI.

4

Facility, Plaintiff expressed an interest.  In the course of these discussions, Plaintiff and

DCCI entered into a confidentiality agreement (the "Agreement") on January 20, 2010.

The Agreement recited that during their negotiations, the parties "may disclose to [each]

other . . . certain non-public information with respect to their products, services,

proprietary rights, businesses, business plans, customers, methods of operation, trade

secrets, manufacturing practices, testing procedures and like information."  (Plaintiff's

Motion, Ex. A, Confidentiality Agreement at 1.)  Accordingly, the parties promised, with

certain limited exceptions, not to disclose this confidential information "to any third

party," and not to use this confidential information "to impose commercial injury upon

the other party, to pursue the other's customers, or in any other way detrimental to the

party or its shareholders."  (*Id.*)[3]  These restrictions on the use and disclosure of

confidential information did not apply, however, to "information which (a) is or becomes

public knowledge other than as a result of a breach of the obligations of the parties

hereunder; (b) was known to [the] recipient prior to its disclosure by [a] party . . . ; or (c)

becomes available from a third party not known to be under any confidentiality obligation

to the parties with respect thereto."  (*Id.* at 2.)  Finally, the parties agreed to remain bound

by the terms of the Agreement for three years, unless they entered into a "further or

---

[3]Plaintiff explains that because its possible purchase of the Facility was motivated in large part by a desire to secure its sizable business with Exim, it was particularly concerned that Exim might learn about its negotiations with DCCI to obtain the Facility.

5

substitute agreement" that terminated their obligations under the Agreement.  (*Id.* at 1.)[4]

**C.    During the Parties' Year-Long Discussions over Plaintiff's Possible Purchase of the Facility, DCCI Allegedly Breaches the Agreement by Informing Third Parties About These Negotiations**

According to Plaintiff, as it and DCCI continued their discussions over the next several months concerning Plaintiff's possible purchase of the Facility, DCCI breached the Agreement on several occasions by informing third parties of Plaintiff's interest in acquiring the Facility.  In February of 2010, for example, Dwayne Buchholz sent an e-mail to an individual at Fresenius Medical Care stating that one of Plaintiff's representatives "said he would rather buy the [Facility] than buy product from us," and that Plaintiff was "talking 2 million, half in cash and half in stock," to purchase the Facility.  (Plaintiff's Response, Ex. H, 2/22/2010 E-mail.)  In June of 2010, Keith Buchholz advised a representative of Advanced Renal Technologies that "[t]he way things stand right now, . . . we will be proceeding with either selling the plant to Rockwell or shutting down the operations if the current deal we are working on with Rockwell falls through."  (Plaintiff's Response, Ex. J, 6/29/2010 E-mail.)  Then, in November of 2010, Keith Buchholz sent an e-mail to another potential purchaser of the Facility, William Griswold, disclosing the price and other terms "being offered in our current Rockwell deal" and opining that he was "almost certain that Minntech would continue buying from

---

[4]As Defendants point out, while the Agreement prohibited the disclosure of confidential information to third parties, it did not mandate that DCCI would negotiate exclusively with Plaintiff for the purchase and sale of the Facility.  Rather, DCCI remained free to explore the possible sale of the Facility to other companies, so long as it did not disclose Plaintiff's confidential information during these efforts.

you as they had agreed to buy from Rockwell if that deal goes forward," (Plaintiff's

Response, Ex. M, 11/17/2010 E-mail), and he sent another e-mail to Griswold the same

day promising to provide him with "everything that has been sent over to Rockwell

during their due diligence process," (Plaintiff's Response, Ex. N, 11/17/2010 E-mail).[5]

**D.    In January of 2011, DCCI Accepts Exim's Offer to Purchase the Facility**

When DCCI's negotiations with Plaintiff progressed slowly and failed to result in

an agreement to purchase the Facility, DCCI again approached Exim in August of 2010 to

inquire about its interest in acquiring the Facility.  According to Exim's owner, president,

and chief executive officer, Daniel Rangel, Exim learned at about this time that its client

had been awarded the majority of the Venezuelan business for the following year,[6] and

this development made the possible purchase of the Facility more attractive to Exim.

In November of 2010, Plaintiff submitted an offer to DCCI under which it would

acquire the Facility through a lease-to-buy transaction.  This proposal called for a total

purchase price of $1 million to be paid over 83 months.  (*See* Defendants' Motion, Ex. 21,

Proposed Equipment Lease Agreement.)  Dwayne Buchholz has testified that this

_____

[5]In their response to Plaintiff's motion, Defendants argue that issues of fact remain as to whether these and other communications between DCCI and third parties constituted breaches of the Agreement.  Defendants maintain, for instance, that at least some of these third parties were already aware, prior to the execution of the Agreement, of Plaintiff's interest in purchasing the Facility, so that no confidential information was divulged when DCCI subsequently confirmed this interest and noted its ongoing discussions with Plaintiff in its communications with third parties.  The Court need not resolve this question, in light of its disposition of the parties' cross-motions on different grounds.

[6]Exim's Venezuelan client, RisMed, is owned by Daniel Rangel's father.

proposal included terms that he deemed "totally unacceptable." (Defendants' Motion, Ex. 1, D. Buchholz Dep. at 63.)  Shortly thereafter, in December of 2010, Exim sent DCCI a letter of intent, offering to purchase the Facility for a cash payment of $1 million. (*See* Defendants' Motion, Ex. 23, 12/16/2010 Letter of Intent.)  Still another interested party, William Griswold, also submitted a letter of intent to DCCI, offering to purchase the Facility for $1.347 million payable over three years. (*See* Defendants' Motion, Ex. 24, 12/17/2010 Letter of Intent.)

On January 7, 2011, DCCI notified Exim that it was accepting Exim's offer to purchase the Facility. (*See* Defendants' Motion, Ex. 25, 1/7/2011 E-mail.)  Keith Buchholz advised Plaintiff of this decision in a January 10, 2011 e-mail, explaining that "at this time we find it suit[]s us best to sell the facility outright." (Defendants' Motion, Ex. 26, 1/10/2011 E-mail.)  In April of 2011, Exim informed Plaintiff that in light of its purchase of the Facility from DCCI, it would no longer be purchasing any acid or bicarbonate product from Plaintiff. (*See* Plaintiff's Response, Ex. X, 4/26/2011 E-mail.)[7]

This lawsuit followed on May 9, 2011, with Plaintiff alleging that DCCI's disclosures of confidential information to third parties in violation of the Agreement served to thwart Plaintiff's planned purchase of the Facility, and resulted in Exim's purchase of the Facility instead.  As a consequence, Plaintiff alleges that it has lost

---

[7]To be accurate, the parties agree that the Facility was not actually acquired by Exim, but instead was purchased by Dialysis Medical Solutions LLC, an entity formed by Exim's owner for the purpose of acquiring the Facility.  The parties ignore this distinction and refer to the buyer as Exim, and the Court will do likewise in this opinion.

substantial revenues that it would have realized through continued sales of hemodialysis liquids to Exim.  In its first amended complaint, Plaintiff has asserted a breach of contract claim against DCCI and Di-Chem (which is alleged to be an alter ego of DCCI), and a claim of tortious interference with an advantageous business relationship against all four Defendants.

## III.  ANALYSIS

### A.     The Standards Governing the Parties' Cross-Motions for Summary Judgment

Through the present cross-motions, Plaintiff and Defendants seek an award of summary judgment in their favor on either certain elements (in the case of Plaintiff's motion) or the entirety (in the case of Defendants' motion) of the claims asserted in Plaintiff's first amended complaint.  Under the applicable Federal Rule, summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  In addition, where a moving party — here, Plaintiff — seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find

9

other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment," *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted), and the nonmoving party must "do more than show that there is some metaphysical doubt as to the material facts" in order to withstand a properly supported summary judgment motion, *Petroleum Enhancer, LLC v. Woodward,* 690 F.3d 757, 772 (6th Cir. 2012) (internal quotation marks and citation omitted).

**B.    The Record Fails as a Matter of Law to Establish a Causal Connection Between Defendants' Alleged Breach of the Confidentiality Agreement and the Injuries Claimed by Plaintiff.**

In Count I of its first amended complaint, Plaintiff has asserted a breach of

contract claim, alleging that Defendants' purported disclosure of non-public information to third parties in violation of the parties' confidentiality agreement (the "Agreement") caused Plaintiff to lose (i) "an opportunity to gain a competitive advantage in the marketplace by acquiring" DCCI's Lewisberry, Pennsylvania manufacturing facility (the "Facility"), and (ii) the "significant revenue it would have realized from the continued sale of hemodialysis concentrates to Exim" once it, rather than Exim, acquired this Facility.  (First Amended Complaint at ¶¶ 54-55.)  Defendants now seek summary judgment in their favor on this breach of contract claim, arguing that Plaintiff has failed to produce evidence from which a trier of fact could conclude that either of these alleged injuries was attributable to any breach of the Agreement.  The Court agrees.

    To establish a breach of contract under Michigan law, Plaintiff must show by a preponderance of the evidence (i) that there was a contract between the parties, (ii) that Defendants breached the contract, and (iii) that Plaintiff "suffered damages as a result of the breach."  *Miller-Davis Co. v. Ahrens Construction, Inc.,* 296 Mich. App. 56, 817 N.W.2d 609, 619 (2012); *see also Webster v. Edward D. Jones & Co.,* 197 F.3d 815, 819 (6th Cir. 1999) (applying Michigan law).[8]  For purposes of their present motion, Defendants do not contest that their disclosures to third parties (other than Exim)

_____

        [8]The parties' Agreement expressly provides that it is "governed by the laws of the State of Michigan."  (Plaintiff's Motion, Ex. A, Confidentiality Agreement at 3.)  In addition, the parties cite solely to Michigan law in their briefs, both with respect to Plaintiff's breach of contract claim and with respect to its claim of tortious interference.  Thus, the Court follows the parties' lead and looks to Michigan law in addressing the substantive issues raised in the parties' cross-motions.

regarding Plaintiff's interest in the Facility and the parties' negotiations toward this potential acquisition could qualify as breaches of the Agreement.[9]  Nonetheless, they insist that Plaintiff lacks evidence to establish the requisite causal connection between any such breach and the injuries identified in its complaint.

As Defendants observe, and as Plaintiff seemingly recognizes in its complaint and its response to Defendants' motion, (*see* First Amended Complaint at ¶ 50; Plaintiff's Response Br. at 10-13), in order for Plaintiff to establish this causal connection, it must produce evidence from which a trier of fact could permissibly conclude that Exim obtained confidential information within the scope of the Agreement as a result of Defendants' breach of this Agreement.  Otherwise, Exim's decision to bid on and acquire the Facility — the act giving rise to the injuries claimed by Plaintiff — could not have been influenced by confidential information learned by virtue of Defendants' alleged breach, but instead must have been based on factors independent of any such breach.  In its response to Defendants' motion, Plaintiff identifies three means by which it can forge this link between Exim's knowledge of confidential information and Defendants' breach: (i) through direct evidence that Defendants divulged this confidential information to Exim; (ii) through circumstantial evidence from which a trier of fact could infer such a disclosure by Defendants to Exim; and (iii) through evidence that confidential

---

[9]As observed earlier, Plaintiff's motion seeks a determination as a matter of law that Defendants breached the Agreement.  Defendants oppose this motion, arguing that issues of fact remain as to whether their disclosures to third parties constituted breaches of the Agreement.  In their own cross-motion, however, Defendants do not contest this issue, but instead focus on the third and final element of Plaintiff's breach of contract claim.

information divulged by Defendants to other third parties was relayed to Exim.  The Court addresses each of these proposed avenues of proof in turn.

First, in claiming that it has produced direct evidence of Defendants' disclosure of confidential information to Exim, Plaintiff points to the deposition testimony of its president, Robert Chioini, that Exim's owner, Daniel Rangel, told him during a phone call that Defendants had informed Exim that they were negotiating with Plaintiff over the possible purchase of the Facility.  (*See* Plaintiff's Response, Ex. D, Chioini Dep. at 157-59.)  As Defendants correctly observe, however, this testimony by Mr. Chioini about an out-of-court statement made to him by Mr. Rangel, who in turn informed him about still another out-of-court statement made to Mr. Rangel by Defendants, is double hearsay that the Court may not consider in resolving the parties' summary judgment motions.  *See Sperle v. Michigan Department of Corrections,* 297 F.3d 483, 495 (6th Cir. 2002) (emphasizing that "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact").

In an argument relegated to a footnote, Plaintiff asserts that it can overcome each of the two levels of hearsay encompassed in Mr. Chioini's testimony.  First, Plaintiff correctly observes that Defendants' out-of-court statement to Mr. Rangel may qualify for consideration as the statement of an opposing party.  *See* Fed. R. Evid. 801(d)(2)(A).  Yet, this still leaves Mr. Rangel's out-of-court statement to Mr. Chioini, in which he relays what Defendants purportedly told him about their negotiations with Plaintiff for the purchase of the Facility.  Plaintiff suggests that Mr. Rangel's statement is not being

13

offered for an impermissible purpose — *i.e.,* for the truth of the matter asserted in this statement, *see* Fed. R. Evid. 801(c)(2) — but instead may be considered to establish Mr. Rangel's knowledge of the negotiations between Plaintiff and Defendants.  *See Michigan First Credit Union v. CUMIS Insurance Society, Inc.,* 641 F.3d 240, 251 (6th Cir. 2011) (noting that a statement is not hearsay if it is "not offered to prove the truth of the matter asserted, but to demonstrate [the speaker's] knowledge, or lack thereof").  If this statement is offered, however, only for the limited, non-hearsay purpose of demonstrating Mr. Rangel's knowledge of these negotiations, it cannot shoulder the evidentiary burden Plaintiff seeks to satisfy through Mr. Chioini's testimony about what Mr. Rangel told him — namely, to show that Defendants ***informed*** Mr. Rangel of these negotiations, in violation of the Agreement.[10]  This objective can only be achieved by considering the truth of the matter asserted in Mr. Rangel's statement to Mr. Chioini — *i.e.,* that he knew about the negotiations because Defendants told him — and the rule against hearsay

---

[10]Notably, Mr. Rangel denied this assertion in an affidavit, stating:

> I now know that Rockwell was one of the parties with whom [Defendant DCCI] was negotiating [for the Facility].  However, nobody at [DCCI] ever disclosed this fact to me before or during [the] negotiations for Exim's purchase of [the Facility].  No one from [DCCI] ever provided me with any Rockwell information whatsoever.

(Defendants' Motion, Ex. 12, Rangel Aff. at ¶ 13.)  Similarly, Mr. Rangel repeatedly testified at his deposition that he did not know at the time of Exim's negotiations with DCCI that Plaintiff was a potential purchaser of the Facility, and that he learned this fact only upon the commencement of this litigation.  (*See* Defendants' Motion, Ex. 11, Rangel Dep. at 68, 75, 85-86, 109.)

precludes this use of Mr. Rangel's statement.[11]

Turning next to Plaintiff's proffer of circumstantial evidence to establish Defendant's disclosure of confidential information to Exim, Plaintiff first contends that such a disclosure may reasonably be inferred from the evidence that "Defendants told everyone else [they] spoke to about the Facility that Rockwell was negotiating to acquire it." (Plaintiff's Response Br. at 11.) In other words, since Defendants divulged these

---

[11]Throughout its response to Defendants' motion, Plaintiff repeatedly blurs this important distinction between Exim's **knowledge** of the negotiations between Plaintiff and Defendants for the purchase of the Facility and the **source** of this knowledge. At one point in its response brief, for example, Plaintiff characterizes Defendants' motion as arguing "that summary judgment is . . . appropriate because there is no evidence that Exim ever learned of Rockwell's interest" in purchasing the Facility. (Plaintiff's Response Br. at 11; *see also id.* at 13 (identifying this as the "central argument" presented in Defendants' motion).) In fact, in the cited portion of Defendants' motion, they argue that "there is no admissible evidence to support Rockwell's . . . two theories[] that **Defendants told Exim** about Rockwell's interest or that **they provided Exim sufficient information** for it to deduce Rockwell's interest." (Defendants' Motion, Br. in Support at 12 (emphasis added).) While Defendants do contend elsewhere in their motion that "Exim did not even know about Rockwell's interest in acquiring the Facility until after [DCCI] had accepted [Exim's] offer," (*id.* at 14), this assertion rests upon the testimony of Mr. Rangel, and is offered in support of an entirely separate argument advanced by Defendants (and addressed below) — namely, that "Exim's decision to purchase the Facility was unrelated to Rockwell's interest in acquiring it," (*id.*).

Despite Plaintiff's repeated efforts to conflate Exim's knowledge and the source of this knowledge, it is important to emphasize that these are two distinct factual issues, and that Defendants cannot be viewed as the inevitable source of Exim's knowledge. To confirm that this is so, one need only consider the deposition testimony of William Griswold, another third party who joined Plaintiff and Exim in bidding on the Facility. Mr. Griswold testified that prior to making this bid, he had either learned or at least suspected that Plaintiff was a potential buyer of the Facility, and he explained that he arrived at this knowledge or suspicion either (i) through a personal acquaintance who worked for Plaintiff, or (ii) by deducing, through his knowledge of the relevant market and competitors, that Plaintiff was "[t]he only other manufacturer in the U.S. that would have had any interest" in purchasing the Facility. (Defendants' Response, Ex. 14, Griswold Dep. at 20-25, 53.) Plainly, then, Defendants were not the only possible source of a third party's awareness that Plaintiff might be interested in acquiring the Facility.

negotiations to other third parties in purported violation of the Agreement, it stands to reason, in Plaintiff's view, that they would not have hesitated to inform Exim of these negotiations. As this Court recently discussed at length, however, "[t]his proposed inference . . . — often referred to in the law as a 'propensity inference' — runs afoul of a very basic and centuries-old legal principle that has been codified in the Federal Rules of Evidence." *Flagg v. City of Detroit,* 827 F. Supp.2d 765, 798 (E.D. Mich. 2011) (citation omitted). In particular, the courts have invoked Federal Rule of Evidence 404(b) to preclude the introduction of evidence of a party's actions on other occasions for the purpose of showing that the party acted the same way in the incident of relevance to the current suit. *See, e.g., Turner v. Scott,* 119 F.3d 425, 430 (6th Cir. 1997); *Connelly v. Hyundai Motor Co.,* 351 F.3d 535, 546-47 (1st Cir. 2003) *Becker v. Arco Chemical Co.,* 207 F.3d 176, 191-93 (3d Cir. 2000); *Flagg,* 827 F. Supp.2d at 798-99 (collecting cases).

Thus, "Rule 404(b) dictates the exclusion of otherwise relevant evidence if the chain of logical inferences leading to its relevance includes the inference that a bad person is disposed to do bad acts." *Flagg,* 827 F. Supp.2d at 799 (internal quotation marks and citation omitted). Plaintiff's proposed showing here of a disclosure by Defendants to Exim clearly incorporates this impermissible inference, as is evident from the pertinent portion of Plaintiff's brief in opposition to Defendants' motion. (*See* Plaintiff's Response Br. at 11 (arguing that since "Defendants told everyone else [they] spoke to about the Facility that Rockwell was negotiating to acquire it," their "post-litigation position that they were careful never to inform Exim despite their disclosure to

16

all these other entities strains credibility").)  Under the well-established evidentiary principle embodied in Rule 404(b), Plaintiff cannot establish that Defendants disclosed confidential information to Exim solely by resort to evidence that Defendants made similar disclosures to other third parties.

Plaintiff also contends that Defendants' disclosure to Exim may be shown circumstantially through evidence suggesting that Exim knew that Plaintiff was among the companies interested in purchasing the Facility.  To demonstrate this purported awareness, Plaintiff points to a January 14, 2011 e-mail message from Exim's chief financial officer, Stephen Callaghan, to Mr. Rangel, in which Mr. Callaghan cryptically states that the "3rd Bidder for the plant was a Canadian Company[,] [n]ot sure who as yet, will find out."  (Plaintiff's Motion, Ex. M, 1/14/2011 E-mail at 3.)  Because Plaintiff is a Michigan corporation, and because Exim presumably knew this, Plaintiff construes this e-mail as evidencing that "Exim knew that Rockwell was one of the bidders and planned to find out the identity" of the third bidder, who turned out to be William Griswold, a Canadian.  (Plaintiff's Response Br. at 13.)

As Defendants correctly observe, Plaintiff's reliance on this e-mail "requires several logical leaps" that the record does not support.  (Defendants' Reply Br. at 1.)  First, this e-mail was sent only *after* Defendants notified Exim on January 7, 2011 that they were accepting Exim's bid to purchase the Facility, and long after Exim submitted this bid on December 16, 2010.  Exim's after-the-fact January 14, 2011 internal correspondence is relevant, therefore, only if one assumes (without any evidentiary basis)

17

that it accurately reflects the state of Exim's awareness **before** this company decided to make a bid for the Facility.  Anything that Exim learned after its December 16, 2010 bid, whether from Defendants or otherwise, plainly had no causal connection to the company's decision to bid on the Facility.  Next, Mr. Callaghan's terse and ambiguous statement in his e-mail that he did not yet know the identity of the "3rd bidder for the plant" does not necessarily show that he knew the identity of the second bidder, much less that he could correctly identify Plaintiff as this second bidder.  Finally, and most importantly, even if each of these ambiguities is resolved in Plaintiff's favor, and even if one assumes that Mr. Callaghan's e-mail evidences Exim's knowledge in a relevant time frame that Plaintiff was one of the bidders on the Facility, there once again is no evidence in the record that Defendants were the source of this knowledge, whether through direct contact with Exim or by virtue of a disclosure to another third party that then was relayed to Exim.

Plaintiff's third and final piece of circumstantial evidence offered to show Defendants' disclosure of confidential information to Exim warrants little discussion.  In particular, Plaintiff points to an e-mail sent by Dwayne Buchholz to Keith Buchholz in late January of 2011, after Defendants had accepted Exim's offer and Plaintiff had already "threatened to file suit," (Plaintiff's Response Br. at 13), in which Dwayne Buchholz refers to a draft agreement for Exim's purchase of the Facility and states that he "want[s] something from EXIM acknowledging that they had contact with us prior to the date on Rockwell's confidentiality agreement," (Plaintiff's Response, Ex. Z, 1/29/2011 E-

18

mail).  While Plaintiff views this e-mail as "confirm[ing] [Defendants'] culpability,"

(Plaintiff's Response Br. at 13), Plaintiff never endeavors to explain what this

"culpability" might be, much less suggest how this e-mail might tend to show that

Defendant disclosed confidential information to Exim in violation of the Agreement.

This leaves only the possibility that confidential information divulged by

Defendants to other third parties could have been relayed to Exim and used as a factor in

Exim's decision to bid on the Facility.  Defendants explored this question at Mr. Chioini's

deposition, however, and he conceded that Plaintiff has no evidence of information

disclosed by Defendants to other third parties and then shared with Exim.  (*See*

Defendants' Motion, Ex. 28, Chioini Dep. at 92-96.)  Rather, Mr. Chioini merely opined

that Exim would inevitably learn information shared by Defendants with other third

parties because "it's a very small industry and everybody talks."  (*Id.* at 94; *see also*

Plaintiff's Response Br. at 12 (contending that it would be "reasonable for the jury to

conclude that, even if Defendants did not tell Exim directly, telling all other players in the

industry would guarantee that Exim would also find out given that the hemodialysis

liquid industry is so small and interconnected").)  Such "mere speculation [and]

conjecture" is insufficient to withstand a summary judgment motion, *Lewis v. Philip*

*Morris Inc.,* 355 F.3d 515, 533 (6th Cir. 2004) (internal quotation marks and citations

omitted), particularly in light of (i) Plaintiff's acknowledgment that it has been unable to

uncover any evidence indicating that any third party shared with Exim the information it

had learned from Defendants regarding Plaintiff's interest in the Facility, and (ii) the

19

sworn statements and testimony of Exim officials that Defendants did not disclose the

existence or status of their negotiations with Plaintiff during the negotiations leading to

Exim's purchase of the Facility, and that Exim did not know about Plaintiff's interest in

the Facility as it engaged in these negotiations and submitted its offer to buy the Facility.

(*See* Defendants' Motion, Ex. 11, Rangel Dep. at 75-76; Ex. 12, Rangel Aff. at ¶¶ 12-15;

Ex. 13, Callaghan Aff. at ¶¶ 4-5.)[12]

Next, even assuming that Plaintiff had produced evidence from which a trier of

fact could conclude that Exim learned from Defendants, either directly or indirectly, of

Plaintiff's interest in and negotiations for the possible purchase of the Facility,

Defendants correctly point out that Plaintiff's breach of contract claim would face still

another (and equally insurmountable) causal hurdle.  In particular, to establish the

requisite causal link between Defendants' alleged breach of the Agreement and the

damages claimed to have arisen from this alleged breach, Plaintiff must produce evidence

that Exim actually ***made use*** of the information it purportedly learned from Defendants —

in other words, that Exim's decision to bid on the Facility was attributable to confidential

information it learned regarding Plaintiff's interest in the Facility.  Yet, Exim's owner,

---

[12]The Court notes that Plaintiff's "small industry" reasoning cuts as much against its proposed inference as in favor of it.  As noted earlier, another bidder on the Facility, William Griswold, testified at his deposition that he was able to deduce that Plaintiff likely was negotiating with DCCI for the possible purchase of the Facility because of the small number of domestic manufacturers that would have had an interest in the Facility. (*See* Defendants' Response, Ex. 14, Griswold Dep. at 20-21.)  Thus, Exim need not necessarily have relied on information divulged by Defendants to other third parties in order to arrive at this same conclusion.

Daniel Rangel, has stated in an affidavit that this allegation "is false," and that "Exim's decision to purchase the facility was made solely on an economic basis, because Exim anticipated it could manufacture acid and bicarbonate concentrates itself to fulfill the requirements of its client in Venezuela for less than it could purchase those products from any supplier."  (Defendants' Motion, Ex. 12, Rangel Aff. at ¶ 16; *see also* Defendants' Motion, Ex. 11, Rangel Dep. at 124.)  To be sure, Plaintiff's president, Mr. Chioini, and its chief financial officer, Thomas Klema, have testified to their "belief" that Exim's interest in the Facility was triggered by information Exim learned from Defendants.  (*See* Defendants' Motion, Ex. 9, Chioini Dep. at 177; Ex. 10, Klema Dep. at 106-07.)  Mr. Klema conceded, however, that he was unaware of any facts or "specific information" that would support this belief, (*id.* at 106), and it is well established that "[s]uch subjective beliefs, unbacked by facts within the personal knowledge of the witness, cannot assist Plaintiff[] in withstanding summary judgment."  *Flagg,* 827 F. Supp.2d at 775.

In an effort to avoid this result, Plaintiff once again suggests that it has produced circumstantial evidence from which a trier of fact could infer that "Exim abruptly reversed course and moved aggressively to purchase the Facility from underneath Rockwell" only after "Defendants informed Exim of Rockwell's negotiations and business plans."  (Plaintiff's Response Br. at 15.)  This proposed circumstantial showing, however, rests almost exclusively on the bare fact of Exim's "reversed course" — *i.e.,* the evidence that Exim expressed no interest in purchasing the Facility when initially

21

approached by Defendants in late 2009 or early 2010, but then decided later in 2010 that it would bid on the Facility.[13]  In Plaintiff's view, this "sudden[] interest[]," which purportedly manifested itself "for the first time when Rockwell was close to finalizing its deal [for the Facility] and Defendants were anxious to sell to someone else," (Plaintiff's Response Br. at 16), provides a sufficient basis upon which a trier of fact could infer the requisite causal link between Defendants' alleged disclosure of confidential information to Exim and Exim's subsequent decision to bid on the Facility.

Yet, even if this reversal of course by Exim, standing alone, would permit the inference that Plaintiff seeks to draw from it, the record also includes evidence of another explanation for Exim's interest in the Facility in late 2010.  Specifically, Mr. Rangel has testified that this interest was triggered by Exim having learned in the latter part of 2010 that its client, RisMed, had been awarded the majority of the Venezuelan business for the

---

[13]The only other circumstantial evidence identified by Plaintiff, apart from the evidence of Exim's change in plans, is an e-mail sent by Keith Buchholz to Mr. Rangel in August of 2010 in which Defendants renew their attempt to gain Exim's interest in purchasing the Facility.  (*See* Plaintiffs' Response, Ex. Q, 8/4/2010 E-mail.)  In this e-mail, Keith Buchholz advises Mr. Rangel that "[a]s you may know, we were producing all of the Minntech product that was going to Venezuela in prior years," and he emphasizes that "[i]f we no longer have the plant on the east co[a]st there is no way for Minntech to supply product economically out of Minnesota."  (*Id.*) This e-mail, on its face, does not reference any confidential information obtained by Defendants from Plaintiff, but to the contrary seems to refer only to information that perhaps is already known to Exim ("[a]s you may know") and to DCCI's own knowledge, as current owner of the Facility, of this plant's advantage in the market (*i.e.,* that Minntech was reliant on the Facility for the product it shipped to Venezuela).  Certainly, Plaintiff has not endeavored to explain to the Court how this e-mail evidences Keith Buchholz's "utiliz[ation] [of] the information he had learned from Rockwell to appeal to" Exim.  (Plaintiff's Response Br. at 14.)  Nor has Plaintiff produced any evidence that this information played a role in Exim's subsequent decision to bid on the Facility.

22

following year.  (*See* Defendants' Motion, Ex. 11, Rangel Dep. at 117-18, 125-26.)  In light of RisMed's contract with the Venezuelan government, Mr. Rangel testified that he determined that Exim could purchase the Facility and "get all [its] money back within a year."  (*Id.* at 126.)  This newly obtained information would account for the "sudden interest"  and "reversal of course" identified in Plaintiff's response to Defendants' motion.  More to the point, even assuming that the evidence produced by Plaintiff could forge a causal link between Defendants' alleged disclosure of confidential information to Exim and the latter company's subsequent interest in acquiring the Facility, nothing in the record makes this explanation for Exim's purchase of the Facility any more likely than the alternative explanation testified to by Exim's owner, Mr. Rangel.[14]

As Defendants observe, this evidence of (at best) equally likely theories of causation does not suffice under Michigan law to withstand summary judgment.  In *Skinner v. Square D Co.,* 445 Mich. 153, 516 N.W.2d 475, 480 (1994), the Michigan Supreme Court thoroughly addressed the nature of the circumstantial showing a party

---

[14]In its response to Defendants' motion, Plaintiff suggests that Mr. Rangel's testimony should be discounted because he is "admittedly dishonest."  (Plaintiff's Response Br. at 16 n.5.)  Yet, "[i]n reviewing a summary judgment motion, credibility judgments and the weighing of the evidence are prohibited."  *Bennett v. City of Eastpointe,* 410 F.3d 810, 817 (6th Cir. 2005); *see also White v. Baptist Memorial Health Care Corp.,* 699 F.3d 869, 883 n.4 (6th Cir. 2012) (noting that the defendant in that case was "essentially asking this court to make a credibility decision to disbelieve [the plaintiff's] statements, which is inappropriate on summary judgment").  Moreover, in the cited portions of Mr. Rangel's deposition where he acknowledges that he made untrue statements to Plaintiff and to a representative of Defendant DCCI in the course of his business dealings with these firms, Mr. Rangel explains that he did so in an effort to secure a business advantage for his company.  (*See id.* at 50, 113.)  As Defendants correctly point out, Plaintiff's president, Mr. Chioini, has admitted to employing precisely the same business tactics in his dealings with Exim.  (*See* Defendants' Motion, Ex. 9, Chioini Dep. at 157, 159.)

23

must make in order to "permit[] a reasonable inference of causation" under Michigan law.[15]  The *Skinner* court emphasized that "[t]o be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation," and that "at a minimum, a causation theory must have some basis in established fact."  *Skinner,* 516 N.W.2d at 480.  The court then continued:

> However, a basis in only slight evidence is not enough.  Nor is it sufficient to submit a causation theory that, while factually supported, is, at best, just as possible as another theory.  Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred.

516 N.W.2d at 480 (footnote omitted).  The court further explained that "[a] mere possibility of such causation is not enough," and that "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."  516 N.W.2d at 481 (internal quotation marks and citation omitted).

Plaintiff cannot satisfy this standard of causation articulated by the Michigan Supreme Court in *Skinner.*  The theory of causation advanced by Plaintiff here rests entirely on Exim's change in plans over the course of 2010, with this company initially advising Defendants in the early part of the year that it was not interested in acquiring the Facility, but then reversing course and electing to bid on the Facility in December of that

---

[15]Although *Skinner* discusses the issue of causation in the context of a product liability suit, the Michigan courts have recognized that breach of contract and tort claims present similar questions of causation, and that it therefore is appropriate to look to *Skinner* for guidance in addressing the causation element of a breach of contract claim.  *See Miller-Davis Co. v. Ahrens Construction, Inc.,* 296 Mich. App. 56, 817 N.W.2d 609, 620 (2012).

year.  The record, however, provides two possible explanations for Exim's change in plans, and Plaintiff's proposed explanation certainly is no more likely under the evidence than the one advanced by Exim itself.[16]  It follows that Plaintiff has failed to identify a genuine issue of material fact as to the causation element of its breach of contract claim.[17]

## C.    Plaintiff's Lack of Evidence as to Causation Also Defeats Its Tortious Interference Claim.

Plaintiff's remaining claim, as set forth in Count II of its first amended complaint, is that Defendants tortiously interfered with Plaintiff's business relationship with Exim by using the confidential information disclosed to them by Plaintiff to entice Exim to bid on and purchase the Facility.  As discussed briefly below, the Court readily concludes that this claim of tortious interference is defeated on the very same ground — *i.e.,* lack of

---

[16]Indeed, it is highly debatable whether these two explanations qualify as equally likely. Exim's account of its change in plans rests upon the direct testimony of its owner, and nothing in the record casts doubt upon the objective basis cited by Mr. Rangel for this change in course — namely, that Exim's client secured a new contract with the Venezuelan government.  In contrast, Plaintiff concedes that its theory of causation has no direct evidentiary support.  Instead, this theory rests largely on the mere beliefs and suspicions of Plaintiff's corporate officers, as well as a slender reed of weak circumstantial evidence — namely, that Defendants purportedly divulged confidential information to Exim regarding Plaintiff's interest in the Facility, and Exim thereafter expressed an interest, for the first time, in acquiring the Facility.  Given that, as discussed earlier, the first part of this theory (a disclosure by Defendants to Exim) has little or no evidentiary foundation, it is difficult to say that Plaintiff's explanation for Exim's actions has the requisite "basis in established fact," *Skinner,* 516 N.W.2d at 480, much less that it is more likely than the explanation advanced by Exim.

[17]In light of this determination that Defendants are entitled to an award of summary judgment in their favor on Plaintiff's breach of contract claim, the Court need not resolve Plaintiff's cross-motion, which is predicated on the contention that Defendants' breach of the Agreement has been established as a matter of law.  Even accepting this argument, Plaintiff's breach of contract claim fails for lack of evidence to support the causation element of this claim. In addition, the Court need not address Defendants' challenge to the alter ego theory of breach of contract liability that Plaintiff seeks to pursue against Defendant Di-Chem.

evidence of causation — that has led the Court to award summary judgment in Defendants' favor on Plaintiff's breach of contract claim.

To establish a claim of tortious interference with a business relationship or expectancy, Plaintiff must show (i) the existence of a valid business relationship or expectancy, (ii) Defendants' knowledge of this relationship or expectancy, (iii) an intentional interference by Defendants that induced or caused a breach or termination of the relationship or expectancy, and (iv) resulting damage to Plaintiff. *See Health Call of Detroit v. Atrium Home & Health Care Services, Inc.,* 268 Mich. App. 83, 706 N.W.2d 843, 849 (2005). As to the third, causal element of this claim, Plaintiff alleges that Defendants (i) notified Exim of Plaintiff's interest in acquiring the Facility, in violation of the Agreement, and then (ii) "enticed Exim to disband its relationship with Rockwell by disclosing that Exim could eliminate its association with Rockwell if it acquired the Facility." (First Amended Complaint at ¶¶ 63-64.)

As previously discussed with respect to the similar causation element of Plaintiff's breach of contract claim, the record fails as a matter of law to support these allegations. First, the Court already has noted the lack of evidence that Defendants informed Exim of Plaintiff's interest in the Facility, whether directly or indirectly, or that Defendants otherwise provided the means through which Exim learned of confidential information disclosed by Plaintiff to Defendants under the Agreement. Next, even if Plaintiff had produced such evidence, it would then have to show that this disclosure induced Exim to purchase the Facility and terminate its business relationship with Plaintiff. Yet, as

26

already explained, the record produced by Plaintiff on this point suggests no more than the mere possibility of this causal link between a disclosure of confidential information and Exim's decision to bid on the Facility.  Because this theory of causality "is, at best, just as possible as another theory," *Skinner,* 516 N.W.2d at 480 — namely, the theory, as testified to by Mr. Rangel, that Exim purchased the Facility to secure a supply of liquid acid and bicarbonate concentrates to sell to its Venezuelan customer — Plaintiff has failed to meet the standard established under Michigan law for raising a reasonable inference of causation through circumstantial evidence.  Consequently, Defendants are entitled to summary judgment in their favor on Plaintiff's claim of tortious interference.[18]

**D.     Defendant DCCI Has Not Established a Basis for the Imposition of Rule 11 Sanctions.**

Finally, in a separate motion, Defendant DCCI seeks the imposition of sanctions under Fed. R. Civ. P. 11 against Plaintiff and its counsel, arguing that they (i) failed to conduct a reasonable inquiry into the facts before bringing this suit, and (ii) continued to pursue Plaintiff's claims even after a full course of discovery failed to produce evidence in support of Plaintiff's claims.[19]  For the reasons stated below, the Court finds that Rule 11 sanctions are not warranted in this case.

In support of its request for sanctions, Defendant first argues that Plaintiff and its

---

[18]In light of this ruling as to the causal element of Plaintiff's tortious interference claim, the Court need not address Defendants' remaining challenges to this claim.

[19]This motion for sanctions was brought solely by Defendant DCCI, because at the time the motion was filed, Plaintiff had not yet filed its amended complaint in which the remaining Defendants were named as additional parties.

counsel failed in their obligation to conduct a reasonable inquiry into the facts and the law before filing this suit. *See Merritt v. International Ass'n of Machinists & Aerospace Workers,* 613 F.3d 609, 626 (6th Cir. 2010). Yet, to the extent that this argument rests on the assertion that Plaintiff and its counsel should have contacted representatives of third party Exim in an effort to determine whether the allegations of Plaintiff's complaint had a factual basis, Plaintiff notes that its president, Mr. Chioini, did in fact reach out to Exim before bringing this suit in an effort to determine why Exim had acquired the Facility and terminated its relationship with Plaintiff. (*See* Plaintiff's Response, Ex. B, 4/26/2011 E-mail; Ex. A, Chioini Dep. at 177.) Mr. Rangel evidently did not return Mr. Chioini's telephone calls on this subject, and an e-mail he sent to Mr. Chioini falsely states that "purchasing [the Facility] was not my decision." (*See* Plaintiff's Response, Ex. B, 4/26/2011 E-mails; *see also* Ex. G, Rangel Dep. at 113 (acknowledging that this was "not a true statement").) Plainly, then, this pre-suit contact between Plaintiff and Exim did not shed much light on the possible factual basis (or lack thereof) for the allegations put forward in Plaintiff's complaint, and Plaintiff can hardly be faulted for failing to pursue more such efforts. Moreover, Plaintiff points out that Defendant DCCI has agreed to defend and indemnify Exim in the event that Plaintiff asserts claims against this third party, (*see id.* at 36-37), making it unlikely that Exim would prove to be a particularly fruitful source of evidence in support of Plaintiff's claims against DCCI. Finally, Plaintiff correctly observes that none of the cases cited by Defendant DCCI recognize a duty of third-party inquiry of the sort that Defendant seeks to impose upon Plaintiff and

28

its counsel in this case.

Next, to the extent that Defendant argues that a proper pre-suit inquiry should have led Plaintiff to withhold, or at least promptly dismiss, certain of the claims advanced in its initial complaint, Plaintiff responds that all but the breach of contract claim asserted in this initial pleading — including Plaintiff's claims of breach of fiduciary duty, innocent misrepresentation, and fraud — have been dismissed as a result of Plaintiff's filing of an amended complaint. Plaintiff's motion for leave to amend its complaint was filed while the discovery period remained open, and this process of filing an amended complaint was prolonged primarily because of Defendant's considerable efforts to oppose it. Under these circumstances, the Court finds no basis for concluding that Plaintiff or its counsel should be sanctioned under Rule 11 for any shortfalls in their pre-suit investigation.

Turning, then, to the conduct of Plaintiff and its counsel after this suit was filed, Defendant DCCI correctly observes that Rule 11's "requirement of reasonableness is not a one-time obligation" that applies only at the commencement of suit. *B & H Medical, L.L.C. v. ABP Administration, Inc.,* 354 F. Supp.2d 746, 748 (E.D. Mich. 2005) (internal quotation marks and citation omitted), *aff'd,* 526 F.3d 257 (6th Cir. 2008). Instead, "after discovery has been launched, if plaintiffs are still unable to plead a sufficient factual basis for the allegations made against defendants, the spectre of Rule 11 sanctions should guide the actions of plaintiffs' counsel," and "Rule 11 sanctions may properly be based upon the plaintiff's subsequent failure to dismiss the case after becoming aware that it lacked merit." *B & H Medical,* 354 F. Supp.2d at 748 (internal quotation marks and citations

29

omitted).  Defendants maintain that Plaintiff and its counsel violated this continuing duty in this case, by continuing to pursue Plaintiff's claims and to oppose Defendants' summary judgment motion even after it should have been apparent that a full course of discovery had failed to produce evidentiary support for these claims.

Although the question is a somewhat close one, the Court finds that Plaintiff and its counsel did not violate Rule 11 through their continued advocacy of Plaintiff's claims after the close of discovery and in the face of a (now successful) summary judgment motion.  Certainly, this is not a case, as was *B & H Medical,* 354 F. Supp.2d at 748, 750, in which the "discovery period failed to disclose any support for the . . . claims asserted in the complaint," nor can Plaintiff and its counsel be fairly accused of pursuing a "'press forward at all costs' litigation strategy" of the sort that "Rule 11 is intended to deter."  To the contrary, the discovery efforts of Plaintiff and its counsel uncovered numerous instances of Defendants disclosing information to third parties in apparent violation of the parties' Agreement, to the point where Plaintiff was able to assert, with at least some arguable basis in the law and the record, that summary judgment should be awarded in its favor as to certain elements of its breach of contract claim.  In addition, and as noted above, Plaintiff and its counsel moved to amend the complaint to more tightly focus this litigation on Plaintiff's breach of contract claim and its corresponding allegations, while electing to dismiss other claims for which evidentiary support appeared far more tenuous.

To be sure, Plaintiff ultimately has proven unable to marshal the necessary support in the record for the theory of causation advanced in its complaint.  As discussed at length

30

earlier in this opinion, the record compiled in discovery fails to show that Defendants disclosed confidential information to Exim, either directly or indirectly, or that any such disclosure was the cause of the injuries claimed by Plaintiff.  Yet, in light of the evidence produced by Plaintiff reflecting Defendants' apparent disclosures of confidential information to other third parties, it was not unreasonable for Plaintiff to anticipate that further discovery efforts might yet reveal that the information disclosed by Defendants to several participants in a small industry circle ultimately made its way to Exim, nor for Plaintiff and its counsel to argue that the circumstantial evidence unearthed in discovery, viewed in its totality, would permit a trier of fact to draw an inference of such indirect disclosure by Defendants to Exim.  Similarly, while the Court has determined that principles of Michigan law preclude Plaintiff from pursuing a theory of Exim's purchase of the Facility that is no more likely under the record than the competing explanation put forward by Exim itself, Plaintiff's theory enjoys at least some circumstantial support in the record, albeit not enough under Michigan law to put the question before a trier of fact. More generally, given the ample evidence in this case of sharp-elbowed business practices, the Court is not especially inclined to fault Plaintiff and its counsel for failing to secure the cooperation of Plaintiff's business competitors during a highly contested discovery period in getting to the bottom of precisely what transpired in Defendant DCCI's sale of the Facility to Exim.

As this Court recently observed, Rule 11 is "not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories," and "[i]t is not *per se*

31

unreasonable for a lawyer to zealously advocate for his client in the face of strong countervailing evidence." *Church v. Royster, Carberry, Goldman & Associates, Inc.,* No. 09-13493, 2011 WL 6122769, at *3 (E.D. Mich. Dec. 9, 2011). While Rule 11 serves an important purpose in demarcating the line between zealous advocacy and impermissible "press forward at all costs" litigation strategy, the Court cannot say that Plaintiff and its counsel crossed this line in this case. Thus, the Court declines to impose Rule 11 sanctions against Plaintiff or its counsel.

## IV.  CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' August 17, 2012 motion for summary judgment (docket #109) is GRANTED. In light of this ruling, IT IS FURTHER ORDERED that Plaintiff's August 17, 2012 motion for summary judgment (docket #112) and Defendants' August 17, 2012 motion to exclude Plaintiff's expert (docket #106) are DENIED AS MOOT. Finally, IT IS FURTHER ORDERED that Defendant DCCI's May 14, 2012 motion for Rule 11 sanctions (docket #80) is DENIED.

Dated:  March 25, 2013                                 s/Gerald E. Rosen_____
                                                                      Chief Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 25, 2013, by electronic and/or ordinary mail.

                                              s/Julie Owens_____
                                              Case Manager, (313) 234-5135

32